1   Gary L. Eastman (CA BAR# 182518)
    401 West "A" Street, Suite 1785
2   San Diego, CA 92101
    Phone: 619.230.1144
3   Facsimile: 619.230.1194
    Attorney for Plaintiffs
4   Matthew Green & Dr. Greens, Inc.



FILED

09 AUG -3 PM 4:29

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

8                   UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

11  MATTHEW GREEN, an individual,    ) Case No. 09 CV 1 6 7 3     MMA JMA
12  and Dr. Greens, Inc. a           )
    California Corporation            ) COMPLAINT FOR DECLARATORY
13                                    ) JUDGMENT OF PATENT NON-
                                      ) INFRINGEMENT, PATENT INVALIDITY,
14            Plaintiffs,             ) MISUSE OF PATENT, FEDERAL
    -v-                               ) STATUTORY UNFAIR COMPETITION,
15                                    ) COMMON LAW UNFAIR COMPETITION,
                                      ) INTERFERENCE WITH BUSINESS
16  James Matthew Stephens, an       ) RELATIONS, INTERFERENCE WITH
    individual, and Spectrum         ) PROSPECTIVE ECONOMIC ADVANTAGE,
17  Laboratories, an Ohio Corp.      ) AND DEMAND FOR JURY TRIAL
                                      )
18            Defendants.
    _____

20  Plaintiff Alleges:

21                          **Jurisdiction**

22  1.     Plaintiff MATTHEW GREEN (hereinafter "GREEN") is and at

23         all times relevant hereto was, an individual doing business

           in the County of San Diego, State of California.  GREEN is,

24         and was at all relevant times, a resident of the State of

25         California, County of San Diego.

26

ORIGINAL

CP

2.    Plaintiff DR. GREENS, INC. (Hereinafter "DR. GREENS"), is
and at all times herein mentioned was, is and at all times
relevant hereto was, a corporation of the state of
California and doing business in the County of San Diego,
State of California.

3.    Plaintiffs are informed and believe, and on the basis of
such information and belief allege, Defendant JAMES MATTHEW
STEPHENS (hereinafter referred to as "STEPHENS") is an
individual residing in Cincinnati, Ohio, and doing business
as Spectrum Laboratories.

4.    Plaintiffs are informed and believe, and on the basis of
such information and belief allege, Defendant SPECTRUM
LABORATORIES (hereinafter "SPECTRUM") is a business entity,
form unknown, doing business in the County of Cleveland,
State of Ohio.

5.    Plaintiffs are informed and believe, and on the basis of
such information and belief allege, that Defendant STEPHENS
is, and was at all times relevant hereto, an officer,
director, and/or managing agent of SPECTRUM.  Plaintiffs
are informed and believe, and on the basis of such
information and belief allege, that Defendant STEPHENS is,
and was at all times relevant hereto, a resident of the
State of Ohio.

6.    Defendants STEPHENS and SPECTRUM collectively referred to
as "Defendants".

7.    The court has jurisdiction of this action because this litigation arises under the Patent Laws of the United States of America, namely *35 U.S.C. § 1 et seq.* The Court has jurisdiction over this action under *28 U.S.C. § 1331* (federal question), and *28 U.S.C. § 1338(a)* (patents).

8.    The court has jurisdiction of this action for related state law claims arising out of this litigation.  The court has jurisdiction over this action under *28 U.S.C. § 1367(a)* (supplemental jurisdiction).

9.    This Court has personal jurisdiction over the Defendants because, on information and belief, Defendants conduct business in the State of California and within this district, including contracts with California corporations and the advertising and sale of products within this State and through the Internet to California residents.

10.   Venue is proper in this district under *28 U.S.C. §§ 1391(b)* and *1391(c)*.

## General Allegations

11.   At all relevant times, Plaintiff GREEN manufactured, marketed, distributed and sold a cleaning compound known as DR. GREEN'S AGENT X.

12.   On or about January 8th, 2004, defendant STEPHENS applied for a United States Patent for a "Synthetic Urine and Method Of Manufacturing Same."

13.   On or about March 20, 2007, patent number 7,192,776 for a "Synthetic Urine and Method Of Manufacturing Same." was

1    issued to Defendant STEPHENS by the United States Patent

2    and Trademark Office.

3  14.    The registration of the patent number 7,192,776,

4    "Synthetic Urine and Method Of Manufacturing Same" (herein

5    after "7,192,776 Patent" or "'776 Patent"), is attached

6    hereto as exhibit "A" and is incorporated herein by

7    reference the same as if set forth verbatim.

8  15.    Plaintiff is informed and believes, and on the basis of

9    such information and belief alleges, that on or about July

10    22, 2009 Defendants, through legal counsel, sent a cease

11    and desist letter to Plaintiff GREEN.

12  16.    The cease and desist letter received by Plaintiff GREEN

13    from Defendants is attached hereto as exhibit "B" and is

14    incorporated herein by reference the same as if set forth

15    verbatim.

16  17.    In the letter attached hereto as Exhibit "B" Defendants

17    allege that Plaintiff's product DR. GREEN'S AGENT X is

18    within the scope of the 7,192,776 Patent.

19  18.    Defendants further allege that the manufacture of DR.

20    GREEN'S AGENT X infringes the 7,192,776 Patent.

21  19.    Plaintiff further alleges that Defendants have sent

22    written notices to Plaintiff's current and prospective

23    business customers claiming that the AGENT X infringes

24    Defendants' 7,192,776 patent.

25                          **Claim for Relief**

26              **COUNT I.a. PATENT NON-INFRINGEMENT.**

27

28

20.     Plaintiff re-alleges and incorporates herein by reference, the same as if set forth verbatim, the allegations contained in paragraphs 1 through 19.

21.     Defendants have alleged that the 7,192,776 Patent is infringed by Plaintiff's DR. GREEN'S AGENT X product.

22.     Plaintiff, however, asserts that Plaintiff's products do not infringe the claims of the 7,192,776 Patent.

23.     Plaintiff asserts that the DR. GREEN'S AGENT X product manufactured by Plaintiff does not fall within any of the claims of the 7,192,776 Patent.

24.     There is a continuing judicable controversy between Plaintiff and Defendants as to Defendants' right to threaten or maintain suit for infringement of the 7,192,776 Patent, and as to the scope and enforceability thereof, and as to whether any of Plaintiffs' products infringes any valid claim thereof.

25.     Plaintiffs have not infringed, willfully infringed, contributorily infringed, or induced others to infringe, any claim of the 7,192,776 Patent.

26.     Plaintiffs desire a judicial determination of their rights and duties, and declarations by this Court of non-infringement of the 7,192,776 Patent.

### COUNT I.b. PATENT INVALIDITY

27.     Plaintiff re-alleges and incorporates herein by reference, the same as if set forth verbatim, the allegations contained in paragraphs 1 through 26.

28.     Defendants have asserted that the 7,192,776 Patent is valid and infringed by one or more of Plaintiff's products.

COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT, PATENT INVALIDITY, MISUSE OF PATENT, FEDERAL STATUTORY UNFAIR COMPETITION, COMMON LAW UNFAIR COMPETITION, INTERFERENCE WITH BUSINESS RELATIONS, INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AND DEMAND FOR JURY TRIAL

- 5 -

29.   On information and belief, Plaintiffs assert that Defendants manufactured and sold product covered by one or more claims of the 7,192,776 patent long before the filing date of the 7,192,776 patent, and hence in violation of 35 U.S.C. §102, resulting in any issued patent being invalid on its face.

30.   Plaintiff further asserts that the solutions described in the 7,192,776 patent are well known in the industry, and thus, would be obvious in light of the prior art which results in the claims for the 7,192,776 Patent being anticipated and thus not patentable under 35 U.S.C §103.

31.   Plaintiff is informed and believes, and on the basis of such information and belief alleges, that the claims of the 7,192,776 Patent are invalid and therefore cannot be infringed by any of Plaintiff's products.

32.   There is a continuing judicable controversy between Plaintiffs and Defendants as to Defendants' right to threaten or maintain suit for infringement of the 7,192,776 Patent, and as to the validity and enforceability thereof.

33.   Plaintiff asserts that the 7,192,776 Patent is invalid for failing to comply with the patent laws of the United States, including but not limited to *35 U.S.C. §§ 102, 103, 112*, and/or *132*.

34.   Plaintiffs desire a judicial determination of their rights and duties, and declarations by this Court of invalidity of the 7,192,776 Patent.

## COUNT II. MISUSE OF PATENT

35.    Plaintiff re-alleges and incorporates herein by reference, the same as if set forth verbatim, the allegations contained in paragraphs 1 through 34.

36.    Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendants threatened legal action against Plaintiff GREEN in order to remove Plaintiff's DR. GREEN'S AGENT X product from the marketplace.

37.    Plaintiff asserts that Defendants letter attached hereto as Exhibit "B" is attempting to prevent Plaintiff from all advertising, distribution and sale of the non-infringing DR. GREEN'S AGENT X product demonstrates an attempt by Defendants to remove competition from the marketplace through the unlawful use of the 7,192,776 Patent.

38.    Plaintiffs desire a judicial determination of their rights and duties, and declarations by this Court of unenforceability of the 7,192,776 Patent under the doctrine of patent misuse.

## COUNT III. FEDERAL STATUTORY UNFAIR COMPETITION

39.    Plaintiff re-alleges and incorporates herein by reference, the same as if set forth verbatim, the allegations contained in paragraphs 1 through 38.

40.    Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendants have mischaracterized Plaintiff's products as an infringement of the 7,192,776 Patent.

1   41.   Plaintiff is informed and believes, and on the basis of
2         such information and belief alleges, that Defendants'
3         mischaracterization of Plaintiff's products has and will
4         continue to lead to the loss of reputation and goodwill
5         associated with Plaintiff's products.

6   42.   Plaintiff is informed and believes, and on the basis of
7         such information and belief alleges, Defendants'
8         mischaracterization of Plaintiff's DR. GREEN'S AGENT X
9         product constitutes Federal Unfair Competition under *15*
10        *U.S.C. §1125(a),* commonly known as *§42(a) of the Lanham*
11        *Act.*

12                **COUNT IV. COMMON LAW UNFAIR COMPETITION**

13  43.   Plaintiff re-alleges and incorporates herein by
14        reference, the same as if set forth verbatim, the
15        allegations contained in paragraphs 1 through 42.

16  44.   Plaintiff is informed and believes, and on the basis of
17        such information and belief alleges, that Defendants have
18        mischaracterized Plaintiff's products as an infringement of
19        the 7,192,776 Patent.

20  45.   Plaintiff is informed and believes, and on the basis of
21        such information and belief alleges, that Defendants'
22        mischaracterization of Plaintiff's products has and will
23        continue to lead to the loss of reputation and goodwill
24        associated with Plaintiff's products.

25  46.   Plaintiff is informed and believes, and on the basis of
26        such information and belief alleges, Defendants'
27        mischaracterization of Plaintiff's DR. GREEN'S AGENT X
28        product constitutes Common Law Unfair Competition.

## COUNT V. INTERFERENCE WITH BUSINESS RELATIONS

47.   Plaintiff re-alleges and incorporates herein by reference, the same as if set forth verbatim, the allegations contained in paragraphs 1 through 46.

48.   Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendants have mischaracterized Plaintiff's products as an infringement of the 7,192,776 Patent.

49.   Plaintiff is informed and believes, and on the basis of such information and belief alleges, that some number of Plaintiff's current and prospective customers were among those to whom Defendants mischaracterized Plaintiff's products and services.

50.   Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendants were aware the mischaracterizations of Plaintiff's products and services were reaching current and prospective customers of Plaintiff.

51.   Plaintiff is informed and believes, and on the basis of such information and belief alleges, that Defendants intended the mischaracterizations of Plaintiff's products to discourage current customers from using Plaintiff's products.

52.   Plaintiff is informed and believes, and on the basis of such information and belief alleges, that some of Plaintiff's current customers were discouraged from using Plaintiff's products by Defendants' mischaracterization of Plaintiff's cleaning products and services.

53.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that
mischaracterizations by Defendants of Plaintiff's products
by the defendants were the cause of some number of lost
sales by Plaintiff.

**COUNT VI. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

54.    Plaintiff re-alleges and incorporates herein by
reference, the same as if set forth verbatim, the
allegations contained in paragraphs 1 through 53.

55.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that Defendants have
mischaracterized Plaintiff's products as an infringement of
the 7,192,776 Patent.

56.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that some number of
Plaintiff's potential future customers were among those to
whom Defendants mischaracterized Plaintiff's products.

57.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that Defendants were
aware the mischaracterizations of Plaintiff's products were
reaching potential future customers of Plaintiff.

58.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that Defendants
intended the mischaracterizations of Plaintiff's products
to discourage potential future customers from using
Plaintiff's products.

59.    Plaintiff is informed and believes, and on the basis of
such information and belief alleges, that some of

1    Plaintiff's potential future customers were discouraged

2    from using Plaintiff's products by Defendants'

3    mischaracterization of Plaintiff's products.

4  60.    Plaintiff is informed and believes, and on the basis of

5    such information and belief alleges, that

6    mischaracterizations by Defendants of Plaintiff's products

7    by the defendants were the cause of some number of lost

8    sales by Plaintiff.

9

10    **WHEREFORE, plaintiff prays for relief as follows:**

11  a.        The Court declare that United States Patent number

12    7,192,776, and each claim thereof, is invalid;

13  b.        The Court declare that United States Patent number

14    7,192,776, and each claim thereof, is not infringed by

15    Plaintiff;

16  c.        The Court declare that United States Patent number

17    7,192,776 is unenforceable;

18  d.        A preliminary and permanent injunction issue against

19    Defendants' further assertion of allegations of patent

20    infringement against Plaintiff;

21  e.        Plaintiffs be awarded damages in an amount to be

22    determined by the Court;

23  f.        Plaintiff be awarded his attorneys' fees.

24  g.        Plaintiff be awarded his costs of suit herein;

25  h.        That a determination be made that this is an

26    exceptional case and that Plaintiff be awarded his

27    reasonable attorneys' fees and costs; and

28

1  i.          Plaintiff be awarded such other and further relief

2      as the Court deems just and proper.

3

4

5  Dated: August  3 , 2009

6

7

8

9  Gary L. Eastman (CA BAR# 182518)

10  Attorney for Plaintiff Matthew Green
   and Dr. Greens, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT, PATENT INVALIDITY,
MISUSE OF PATENT, FEDERAL STATUTORY UNFAIR COMPETITION, COMMON LAW UNFAIR COMPETITION,
INTERFERENCE WITH BUSINESS RELATIONS, INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
AND DEMAND FOR JURY TRIAL
- 12

## JURY TRIAL DEMANDED

Plaintiff hereby requests trial by jury on all counts of this complaint.

Dated: August  3 , 2009


_____
Gary L. Eastman (CA BAR# 182518)
Attorney for Plaintiff Matthew Green
and Dr. Greens, Inc.

EXHIBIT "A"

US007192776B2

(12) **United States Patent**

Stephens

(10) Patent No.: **US 7,192,776 B2**

(45) Date of Patent: **Mar. 20, 2007**

(54) **SYNTHETIC URINE AND METHOD OF MANUFACTURING SAME**

(76) Inventor: **James Matthew Stephens**, 550 Wards Corner Rd., Unit 102, Cincinnati, OH (US) 45140

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/766,165**

(22) Filed: **Jan. 28, 2004**

(65) **Prior Publication Data**

US 2005/0164395 A1      Jul. 28, 2005

(51) **Int. Cl.**
*G01N 31/00*       (2006.01)

(52) **U.S. Cl.** ............................. 436/8; 436/18; 436/98; 252/408.1; 424/545

(58) **Field of Classification Search** ................... 436/8, 436/18, 98, 19; 252/408.1; 424/545
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,880,646 A | * | 4/1975 | Mc Connell et al. ........ 504/113 |
| 4,146,644 A | | 3/1979 | Griffith et al. |
| 4,714,564 A | * | 12/1987 | Lynch et al. ................ 510/402 |
| 4,825,851 A | * | 5/1989 | Cocks et al. ................... 601/4 |
| 4,989,607 A | * | 2/1991 | Keusch et al. .............. 600/391 |
| 5,036,013 A | | 7/1991 | Wood et al. |
| 5,105,007 A | * | 4/1992 | Adamczyk et al. ......... 562/450 |
| 5,176,668 A | * | 1/1993 | Bernardin ................... 604/368 |
| 5,328,954 A | | 7/1994 | Sarangapani |
| 5,489,281 A | | 2/1996 | Watanabe et al. |
| 5,651,778 A | * | 7/1997 | Melius et al. .......... 604/385.19 |
| 5,993,840 A | * | 11/1999 | Fawkes et al. .............. 424/404 |
| 6,306,422 B1 | | 10/2001 | Batich et al. |
| 6,716,632 B1 | * | 4/2004 | Dorn ............................. 436/18 |
| 2002/0106807 A1 | | 8/2002 | Novinski et al. |
| 2004/0077106 A1 | * | 4/2004 | Haddad ....................... 436/536 |

* cited by examiner

*Primary Examiner*—Maureen M. Wallenhorst

(74) *Attorney, Agent, or Firm*—McDonald Hopkins LLC

(57)       **ABSTRACT**

A synthetic urine solution and method of its manufacture are disclosed. The solution includes water having a pH between 3 and 10. The solution further includes creatinine and means for removing bacteria from the solution so as to control or eliminate sepsis of the urine solution, preferably through the use of biocide. The solution exhibits a specific gravity of from 1.005 g/cm$^3$ to 1.025 g/cm$^3$. Additional compounds may also be included to further enhance the aesthetics or apparent authenticity of the synthetic urine produced according to this invention.

**13 Claims, No Drawings**

US 7,192,776 B2

1

**SYNTHETIC URINE AND METHOD OF MANUFACTURING SAME**

BACKGROUND OF THE INVENTION

This invention relates to a composition and method of manufacturing synthetic urine.

The kidneys remove unwanted substances circulating in the blood by way of producing urine, which is excreted from the body. Consequently, diverse waste substances and other substances unwanted by the body find their way into urine for subsequent removal from the body. Urinalysis is the testing of the composition and amounts of waste substances in urine, and provides a tremendously powerful diagnostic tool for the medical profession. In particular, many of these substances are indicative of certain medical conditions or other substances which have been metabolized by a person's kidneys.

Using current urinalysis techniques, unwanted substances in a urine sample can mask existing medical conditions, while still some others can masquerade as non-existent medical conditions. In each instance, these unwanted substance undermine the usefulness of urinalysis as a medical diagnostic tool. Some of the unwanted substances that find their way into a urine sample are drugs (both legal and illegal) and metabolites thereof, along with other chemical residues or contaminants that may be present or otherwise contacted during the handling procedures. These substances can disturb the sensitive tests, making the actual state of the body difficult or impossible to determine.

For example, insulin levels, para-aminohippuric acid, phenol sulfonphthalein, phosphate, arylsulfatase-A, lysosome, urine amylase, total urine estrogens, specific estrogens, progestins, aldosterone, catecholamines, 5-hydroxyindoleacetic acid, cortisol, homovanillic acid, human chorionic gonadotrophin, creatine, urea, uric acid, bilirubin, hemoglobin, hydroxyproline, melanin, porphorins, total protein, acid mucopolysaccharide, copper, glucose oxidase and urine ketone can all influence the results of most standard urinalysis testing methods in unintended or unpredictable ways.

Essentially, these testing methods include a variety of immunoassays or assays by other techniques, such as isolation followed by gas or liquid chromatography followed by mass spectrometry. These tests make urinalysis a powerful diagnostic tool for identifying a whole range of conditions. For example, substance abuse and other indicia of disease or bodily state can easily be detected by urinalysis. However, in order to accurately establish standards of comparison for such tests, reliable urine samples are needed which are entirely free from any of the aforementioned substances. Thus, the development of a suitable, synthetic urine substitute would improve testing methods by providing researchers, potential urine donors and testing technicians with an accurate baseline reading for "clean" urine samples to compare against other suspect samples.

To illustrate, a method for detecting this compound is described in U.S. Pat. No. 5,036,013, issued to El Sohly et al., where various deuterated cannabinoids are synthesized to help determine the quantitative amount of tetrahydrocannabinol in a urine sample. One method in particular involves spiking a clean urine sample with known amount of deuterated tetrahydrocannabinol and analyzing the resultant sample with gas chromatography/mass spectrometry in order to establish set standards of comparison. However, a failure to possess a truly clean sample could substantially influence and negatively affect the results of these methods.

2

Another example of the problems created by interfering chemicals in urine is exemplified by the case of ibuprophan. Ibuprophan is a prostaglandin synthetase inhibitor that may be taken in large doses to relive pain and inflammation characteristic of arthritis. When a patient taking these massive doses is subjected to urinalysis, it may mask other drugs being taken by the donor, or may even be mistaken for tetrahydrocannabinol (a metabolite which many testing technicians classify as being indicative of marijuana use).

Any misidentification of controlled substance use/abuse, personal information (pregnancy, use of cigarettes, etc.) or any of the numerous medical conditions that can be determined using urinalysis can have devastating personal consequences for the urine donor. Thus, some companies sell inexpensive home testing kits in order to provide some level or reassurance to potential urine donors whether they may have such a misidentification. However, given the potential liability for a misidentified or positive test, many lay persons feel intimidated by testing procedures, and these persons would welcome the ability to utilize a known sample, free from unwanted or unknown substances, for the sake of comparison.

In response to the need for a reliable source of relatively inexpensive, "clean" urine samples which are free from any unwanted or unknown substances, numerous attempts to formulate synthetic urine have been made. For example, U.S. Pat. No. 6,306,422 to Batich et al. (table 3, col. 16, line 50 et seq.), U.S. Pat. No. 5,328,954 to Sarangapani (table 1, col. 9, line 29 et seq.), U.S. Pat. No. 5,489,281 to Watanabe et al. (col. 12, example 6) and U.S. Pat. No. 4,146,644 to Griffith et al. (table 1, col. 10). However, none of these references appears to address a simple composition which can be manufactured in an inexpensive manner.

Additionally, all of these references require the use of creatinine or other compounds which can be consumed by bacteria present in the sample. Accordingly, all of these samples will undergo sepsis unless they are immediately used, thereby making these compounds as unattractive candidates for mass production and/or consumer sales.

SUMMARY OF THE INVENTION

It is an object of this invention to provide a reliable source of synthetic urine, along with a method for its manufacture, which is free from any and all unwanted or unknown substances.

It is a further object of this invention to provide a synthetic urine, along with a method for its manufacture, which is capable of retaining its viability and utility for extended periods of time.

Still further uses for such a synthetic urine can and will be devised by a prospective user based upon her or her own personal disposition, interests and privacy concerns.

Accordingly, a composition of synthetic urine is claimed. This composition includes water, having a pH between 3 and 10 with creatinine and biocide dissolved therein. The composition further includes any compound which dissolves and dissociates in a water solution in a manner which insures that the specific gravity of the resulting solution mixture is between 1.005 g/cm$^3$ and 1.025 g/cm$^3$. Urea can be added as another possible element of the invention, and those skilled in the art will readily identify appropriate specific types of biocide oxiders, organics or in situ agents, along with a host of carbonates, halide salts, hydroxide salts and other chemicals which could serve as ideal ionic compounds within the meaning of the invention.

3

A method for manufacturing synthetic urine is also disclosed. The method involves providing water, dissolving creatinine and biocide in the water, adjusting the resulting solution's specific gravity to be between 1.005 and 1.025 and, if necessary, the pH level of the solution. In another aspect, the method contemplates providing water with a pH between 3 and 10, mixing creatinine and at least one dissociating ionic compound to adjust the specific gravity of the resulting solution to be between 1.005 g/cm³ and 1.025 g/cm³ and removing bacteria from the solution so as to avoid sepsis of the creatinine. In each of these embodiments the same types of biocides and ionic compounds can be used as were identified in the composition embodiment above.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

While human urine may at varying times reflect a wide range of chemical compounds, almost all current urinalysis rely upon observation of three basic traits: pH level, specific gravity and the presence of creatinine. Consequently, it was discovered that an effective, yet cost efficient, synthetic urine solution having a final specific gravity between 1.005 g/cm³ and 1.025 g/cm³ needed only to contain three basic components: water with a pH between 3 and 10; creatinine; and some means for controlling or eliminating the unwanted sepsis of the creatinine. With respect to this final element, this bacteria control/elimination is most readily accomplished through the use of a biocide.

Examining each of these three traits separately, the need for a water-based solution should be apparent. However, it is significant to note that human urine displays a wide range in terms of pH variation—anywhere from 3 to 10. This variation can be attributed to any number of factors regarding regional water quality, metabolic idiosyncrasies displayed by each individual and the like. Thus, the water supplied for the composition and method may need to have its pH adjusted accordingly. Significantly, while use of distilled, deionized water will produce the most reliable synthetic urine solutions in terms of elimination of unwanted substances, the invention may be practiced with equal efficacy using distilled water, deionized water or even regular tap water (drawn from any fresh water source having an appropriately low specific gravity—discussed below). Unless specifically noted to the contrary, use of the term "water" throughout this specification and appended claims is intended to embrace the broadest array of appropriate water sources available.

The final synthetic urine solution must also have a specific gravity between 1.005 g/cm³ and 1.025 g/cm³. Insofar as specific gravity is a measure of relative ionic content of a solution, it should be as apparent to those familiar with body chemistry or kidney functioning that certain ions and compounds will be commonly found in human urine, especially those commonly encountered in food and water sources (for example, sodium, potassium, chloride, etc.). In contrast, other elements will be inherently unwise choices at anything beyond a trace level (for example Lanthanoid and Actinoid series ions). The precise amount of the particular compound or compounds selected to adjust the specific gravity will depend directly on the concentration of compound (if in solution), the molecular weight of its constituents, water temperature, relative volume of water solvent being used and other similar factors. With respect to the water used to manufacture the synthetic urine of the present invention, it is anticipated that significant increases will need to be made to the specific gravity, as distilled, deionized water has a

4

specific gravity of 1.000 g/cm³ and tap water, while likely to vary by region, has a specific gravity around 1.003 g/cm³.

In terms of the best compounds to utilize in adjusting the specific gravity, the single most important trait is that the compound must dissociate when dissolved in water. Additionally, it is preferred to find an inexpensive, widely available compound so as to minimize production costs. To that end, it is believed that carbonate salts, halide salts, hydroxide salts and certain bromides will have particular applicability. By way of illustration rather than limitation, these salts might include sodium bicarbonate, sodium, potassium, magnesium or calcium chlorides; sodium, potassium, or calcium hydroxides; and other similarly inexpensive and widely available salts.

Creatinine is a protein created in connection with muscular activity. As such, medical science recognizes creatinine as an important constituent in the human bloodstream and, to the extent that the kidneys cleanse and purify the bloodstream, in the waste stream expelled from the kidneys in the form of urine. Significantly, because creatinine is a protein, it is the subject of sepsis and decomposition. Thus, creatinine serves as an excellent indicator in urinalysis because it is indicative of human origin and, by virtue of its septic disposition, creatinine also provides a natural measure to determine whether or not a sample was, in fact, recently produced.

In order to insure stable creatinine levels in synthetic urine, it is therefore essential to remove or control the presence of sepsis-causing bacteria. However, whatever method of control is applied must also not interfere with the processes underpinning most urinalysis techniques. Thus, the use of an appropriate biocide is absolutely critical to the proper practice of the present invention. To the extent that human urine is sterile when excreted (under normal body conditions), the use of biocide represents a distinct departure from previous approaches to the manufacture of synthetic urine which relied solely on mimicking the compounds in actual urine without any regard for the long term shelf life of the synthetic solution. Moreover, it further demonstrates the need to select a biocide which is biologically active, yet does not interfere overtly with the chemistry of the synthetic urine solution itself (either through its chemical signature or by virtue of an abnormally large amount being detectable in the solution).

Biocide can be generically defined as substances used to control or eliminate microbial populations in a sample. Three general classes have been identified as having particular applicability when used in connection with the present invention: oxidizing biocides, organic biocides and a somewhat more generalized category referred to as in situ agents. Each will be discussed briefly below, although it should be understood that biocides are a term of art, known to those familiar with water chemistry processes.

Oxidizing biocides are generally self explanatory. This class includes any biologically effective agent which relies upon an oxidation process, including but not limited to various peroxides, hypochlorites, bromides and super oxides. Organic biocides encompass an expansive list of proteins and cyclical compounds known to those skilled in the art. In situ agents can be chemical compounds or actual physical processes designed to kill bacteria in a manner which is either self-generating or effective enough to prevent future degradation of the urine. Generic examples of such in situ agents include ozone, chlorine dioxide (or other dioxides), and ultraviolet radiation or irradiation processes followed by hermetic sealing of the sample.

US 7,192,776 B2

5

6

Specific examples of various biocides contemplated above include: BHAP (such as 2-Bromo-4-hydroxyacetophenone, an organo-bromine group); Bronopol (such as 2-Bromo-2-nitropropane-1,3 diol, an organo-bromine group); Carbamates (such as a mix of sodium dimethyldithiocarbamate (DIBAM) and disodium ethylene bis-dithiocarbamate (NIBAM), or single product, such as potassium n-hydroxymethyl-n-methyldithiocarbamate, an organo-sulfur group); Chlorothioether (such as 2,2 Dihydroxy-5,5-dichlorodiphenyl monosulfide, a chlorinated phenolic thioether); DBNPA (such as 2-2-Dibromo-3-nitrilopropionamide, an organo-bromine group); DTEA, DTEA II (such as 2-(Decylthio)ethanamine, an alkylthioamine group); Guanides (including Guanidine and Biguanides) (such as dodecylguanidine hydrochloride and acetate, also polyhexamethylene biguanide hydrochloride, and tetradecylguanidine, all aliphatic guanadines); Glutaraldehyde (such as Pentane-1,5-dial., an aldehyde group); Isothiazolines (such as Alkyl isothiazolin-3-ones, an organo-sulfur group); MBT (such as Methylene bis(thiocyanate), an organo-sulfur group); Polyquat (such as broad-spectrum, cationic polymers of low molecular weight); Quats (AD-BACs) (such as Alkyldimethylbenzylammonium chloride (also known as alkylbenzyldimethyl ammonium chloride or benzalkonium chloride), a quaternary ammonium compound group); Sulfone (such as Bis(trichloromethyl)sulfone, an organo-sulfur group); TBTO (such as Bis(tributyltin) oxide, an organo-tin group); TBZ (Tertbuthylazine) (such as 2-(tert-butylamino)-4-chloro-6-(ethylamino)-s-triazine, a Triazine group); TCCBN (such as Tetrachloro-2,4,6-cyano-3-benzonitrile, TCCBN functions similarly to the chlorophenols); TCMTB (such as 2(thiocyanomethylthio)benzothiazole); Thione (such as Tetrahydro-3,5,dimethyl-2H-1,3,5-thiadiazine-2-thione, an organo-sulfur group); THPS (TKHPS) (such as Tetrakish(hydroxymethyl)phosphonium sulfate, an alkyl phosphonium group); and TTPC (such as Tributyltetradecylphosphonium chloride, an alkylphosphonium group). Additionally, with respect to more commonly understood items, such as peroxides, hypochlorites and the like, it should be understood that this specification encompasses all forms of such compounds (for example, hydrogen peroxide, sodium peroxide, sodium hypochlorite, potassium hypochlorite, etc.). Other examples of biocides may exist and are expressly encompassed within the purvey of this specification.

Notably, as embraced by this specification, oxidizing biocides—and hypochlorite in particular—should not be confused with the agents that are employed to oxidize metabolites in urine samples. Such metabolite oxidizers are often referred to as "adulterants" within the urinalysis industry. Adulterants are substances deliberately added to actual urine samples to chemically alter the metabolites indicative of certain conditions so as to render these metabolites undetectable by standard urinalysis techniques.

Even though some substances like hypochlorite may possess utility as both a biocide and as an adulterant, the intended use of that substance (as either a biocide or an metabolite oxidizer) will substantially influence the conditions, concentration and manner in which the substance is provided. In particular, use as a biocide requires smaller concentrations and little to no regard for when the biocide is added during the manufacturing process. To illustrate, an oxidizing biocide such as sodium hypochlorite can be added in amounts as small as 1 mL per 3.8 L of water. Similar concentrations of other oxidizing biocides will have equal efficacy, as recognized by those skilled in the art.

In contrast, use of hypochlorite as an adulterant as taught, inter alia, in U.S. patent application Ser. No. 2002/0106807 must occur at higher concentrations and in a specific manner so as to oxidize certain metabolites or compounds. Thus, hypochlorite (and other oxidizing biocides) found in the present solution prevents the unwanted growth of bacteria. Moreover, to the extent that adulterants are often added to actual urine samples, the composition of the resulting mixture is substantially more complex, in terms of the variety of chemical species present, than the simplified composition of the present invention.

Another aspect of the present urine solution relates to the addition of urea in some form to the synthetic urine sample. While urea is not presently accounted for in most urinalysis techniques, its presence within a synthetic urine could add an additional level of realism for some applications. Notably, to the extent that urea is provided, it will need to be considered in the calculations of the amount of ionic dissociating compounds required to adjust the specific gravity and/or pH to the desired levels.

Other functionally inconsequential additives or steps may also be included without departing from the principles of this invention. While these additives and steps expressly cover all foreseeable equivalents of the elements recited above, additional variations are possible. For example, it is possible to include a coloring agent and or olfactory substances to enhance the aesthetics or apparent authenticity of the synthetic urine produced according to this invention.

The foregoing detailed description has been given for clearness of understanding only and no unnecessary limitations should be understood therefrom as some modifications will be obvious to those skilled in the art without departing from the scope and spirit of the appended claims.

I claim:

1. A synthetic urine solution comprising:
water having a pH between 3 and 10;
creatinine and a biocide, said creatinine and biocide dissolved within said water to form a solution exhibiting a specific gravity and said creatinine and biocide selected in relative concentrations to minimize sepsis;
at least one dissociated ionic compound also dissolved within said solution to adjust the specific gravity of the solution to between 1.005 $g/cm^3$ and 1.025 $g/cm^3$; and
wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylammonium chloride, sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2,4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides.

2. The synthetic urine solution of claim 1, further including urea dissolved within said solution.

3. The synthetic urine solution of claim 1, wherein said at least one ionic compound is selected from the group consisting of carbonate salts, halide salts, hydroxide salts and bromides.

4. The synthetic urine solution of claim 3, further including urea dissolved within said solution.

5. A method of manufacturing a synthetic urine solution comprising:
providing water;
dissolving creatinine and biocide into said water to form a solution exhibiting a specific gravity level, said

US 7,192,776 B2

7

creatinine and biocide being selected in relative concentrations to minimize sepsis, wherein said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers,     2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethvlbenzylammonium chloride, sulfones, Bis (tributyltin) oxide, tertbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile,     2(thiocyanomethylthio) benzothiazole,   thiones,   Tetrakish(hydroxymethyl) phosphonium sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides; and

adjusting said specific gravity level of said solution to between 1.005 g/cm³ and 1.025 g/cm³.

**6.** The method of claim 5 further comprising sealing said synthetic urine solution within a container so as to further minimize sepsis of said synthetic urine solution.

**7.** The method of claim 6 further comprising adding urea to said synthetic urine solution.

**8.** The method of claim 5 further comprising adding urea to said synthetic urine solution.

**9.** The method of claim 5, further comprising the step of adjusting the pH level of the solution between 3 and 10.

**10.** A method of manufacturing a synthetic urine solution comprising:

providing water having a pH between 3 and 10;

dissolving creatinine and at least one dissociating ionic compound in the water to form a solution exhibiting a

8

specific gravity, said creatinine and at least one dissociating ionic compound selected in relative concentrations to adjust said specific gravity to between 1.005 g/cm³ and 1.025 g/cm³; adding a biocide into said solution, said biocide is selected from the group consisting of 2-bromo-4-hydroxyacetophenone, bronopols, carbamates, chlorothioethers, 2-2-Dibromo-3-nitrilopropionamide, 2-(Decylthio)ethanamine, glutaraldehydes, isothiazolines, Methylene bis(thiocyanate), polyquat, Alkyldimethylbenzylamnionium chloride, sulfones, Bis(tributyltin) oxide, tertbuthylazines, Tetrachloro-2, 4,6-cyano-3-benzonitrile, 2(thiocyanomethylthio)benzothiazole, thiones, Tetrakish(hydroxymethyl)phosphonium                         sulfate, Tributyltetradecylphosphonium chloride, peroxides, hypochlorites, and super oxides; and

removing bacteria from said solution.

**11.** The method of claim 10 wherein the step of dissolving creatinine and at least one dissociating ionic compound also includes dissolving urea in the water, said urea selected in a concentration relative to that of said creatinine and at least one dissociating ionic compound so as to maintain the specific gravity of the solution between 1.005 g/cm³ and 1.025 g/cm³.

**12.** The method of claim 11, further comprising the step of sealing said synthetic urine solution within a container.

**13.** The method of claim 10, further comprising the step of sealing said synthetic urine solution within a container.

\*   \*   \*   \*   \*

1    EXHIBIT "B"

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT, PATENT INVALIDITY,
MISUSE OF PATENT, FEDERAL STATUTORY UNFAIR COMPETITION, COMMON LAW UNFAIR COMPETITION,
INTERFERENCE WITH BUSINESS RELATIONS, INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
AND DEMAND FOR JURY TRIAL



McDonald Hopkins LLC
Attorneys at Law

600 Superior Avenue, East
Suite 2100
Cleveland, Ohio 44114

P 216.348.5400
F 216.348.5474

July 22, 2009

**VIA EXPRESS MAIL**

Dr. Green's
Matt Green
4901 Morena Blvd., Suite 1106
San Diego, CA 92117

   Re: **Spectrum Laboratories' U.S. Patent No. 7,192,776**

Dear Mr. Green:

   For nearly two decades Spectrum Laboratories has prided itself on creating and having innovative and original products were an original idea to the market. Spectrum has spent significant resources on the research and development of such products.

   Consistent with this, Spectrum owns U.S. Patent No. 7,192,776, a copy of which is enclosed. Spectrum believes that your Agent X product likely infringes the '776 patent. Please review the '776 patent and let us know by *Monday, August 3, 2009* any basis for which you do not believe that you infringe.

                Sincerely,

                David B. Cupar

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

MATTHEW GREEN, an individual, and DR. GREENS, INC., a California Corporation

**DEFENDANTS**

JAMES MATTHEW STEPHENS, an individual, and SPECTRUM LABORATORIES and Ohio Corporation

(b) County of Residence of First Listed Plaintiff  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Cleveland, OH
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

09 AUG -3 PM 4:29

(c) Attorney's (Firm Name, Address, and Telephone Number)
Gary L. Eastman, Esq. CSB 182518
401 W. "A" St., Ste 1785, San Diego, CA 92101 (619) 230-1144

Attorneys (If Known)

'09 CV 1 6 7 3   BY: MMA JMA

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ❏ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ❏ 2 U.S. Government Defendant
- ❏ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - Med. Malpractice | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal 28 USC 157 | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 365 Personal Injury - Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881 | | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 340 Marine | **PERSONAL PROPERTY** | ❏ 650 Airline Regs. | ☒ 830 Patent | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❏ 345 Marine Product Liability | ❏ 370 Other Fraud | ❏ 660 Occupational Safety/Health | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 690 Other | | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ❏ 810 Selective Service |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 385 Property Damage Product Liability | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | | | ❏ 720 Labor/Mgmt. Relations | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge 12 USC 3410 |
| ❏ 196 Franchise | | | ❏ 730 Labor/Mgmt.Reporting & Disclosure Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate Sentence | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 892 Economic Stabilization Act |
| ❏ 220 Foreclosure | ❏ 442 Employment | **Habeas Corpus:** | ❏ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ Accommodations | ❏ 530 General | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 240 Torts to Land | ❏ 444 Welfare | ❏ 535 Death Penalty | **IMMIGRATION** | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 895 Freedom of Information Act |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | ❏ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - Alien Detainee | | ❏ 950 Constitutionality of State Statutes |
| | ❏ 440 Other Civil Rights | ❏ 555 Prison Condition | ❏ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from another district (specify)
- ❏ 6 Multidistrict Litigation
- ❏ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28: 1331 etc

Brief description of cause:
Declaratory Judgment of Patent Non-Infringement with damages for patent misuse

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE _____   DOCKET NUMBER _____

DATE  August 3, 2009

SIGNATURE OF ATTORNEY OF RECORD  Gary Eastman

**FOR OFFICE USE ONLY**

RECEIPT #  3843   AMOUNT  350.   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

8/3/09

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS003843
Cashier ID: sramirez
Transaction Date: 08/03/2009
Payer Name: GARY EASTMAN
----------------------------------
CIVIL FILING FEE
 For: GREEN V. STEPHENS
 Case/Party: D-CAS-3-09-CV-001673-001
 Amount:        $350.00
----------------------------------
CHECK
 Check/Money Order Num: 1126
 Amt Tendered:  $350.00
----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```